**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| INSPECTIONXPERT CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:19cv65 |
| | ) | |
| KENNETH T. CUCCINELLI, | ) | |
| *Acting Director, United States* | ) | |
| *Citizenship and Immigration* | ) | |
| *Services*,[1] | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

This case comes before the undersigned United States Magistrate Judge for a recommendation on "Defendant's Motion for Summary Judgment" (Docket Entry 17)[2] (the "Defendant's Motion") and "Plaintiff's Motion for Summary Judgment" (Docket Entry 19) (the "Plaintiff's Motion"). For the reasons that follow, the Court should grant Plaintiff's Motion and deny Defendant's Motion.

---

1 Because InspectionXpert Corporation sued L. Francis Cissna in his capacity as Director of the United States Citizenship and Immigration Services (see, e.g., Docket Entry 1 at 1 (identifying as "the Defendant[,] the agency charged with adjudicating [immigration] petitions")), Cissna's successor, Kenneth T. Cuccinelli, automatically substituted as the defendant in this matter. See Fed. R. Civ. P. 25(d). [Citations herein to Docket Entry pages utilize the CM/ECF footer's pagination.]

2 For legibility reasons, this Opinion omits all-cap font in all quotations from the parties' materials.

## BACKGROUND

In April 2018, InspectionXpert Corporation (the "Plaintiff" or "IXC") filed a Petition for a Nonimmigrant Worker (the "Petition") with the United States Citizenship and Immigration Service (the "USCIS" or the "Agency"), seeking a "H-1B Specialty Occupation" visa (a "H-1B visa") (CAR 553)[3] for Sathish Kasilingam ("Kasilingam" or the "beneficiary"), whom IXC wished to employ as a "Quality Engineer" (CAR 545). (See, e.g., CAR 545-554.) IXC, a software publisher (see CAR 546) specializing in "technology products for Quality and Mechanical Engineers working in the manufacturing industry," creates "products [that] lie at the intersection of mechanical engineering and computer science" (CAR 92). (See also CAR 480 (explaining that "[IXC] was designed to simplify the process of creating inspection forms and ballooned inspection drawings for first-article and in-process inspections," which "reports and drawings are created directly from CAD drawings . . . as well as CAD-neutral raster formats")[4].)

Kasilingam, a citizen of India, originally entered the United States on an F-1 student visa to pursue a Master of Science degree in Mechanical Engineering. (See, e.g., CAR 564-587.) After

---

[3] Citations to the "CAR" refer to the Certified Administrative Record filed in this matter. (See Docket Entries 15, 15-1.)

[4] "CAD" refers to "computer assisted drafting." (Docket Entry 20 at 2.)

obtaining his mechanical engineering master's degree from the State University of New York at Buffalo in February 2017 (see CAR 590; see also CAR 574), Kasilingam obtained authorization to work at IXC from March 2017 through February 2018 (see CAR 572) as a "Quality Engineer" (CAR 289) pursuant to 8 C.F.R. § 214.2(f)(10), which permits "a student [to] apply to USCIS for authorization for temporary employment for optional practical training [("OPT")] directly related to the student's major area of study," 8 C.F.R. § 214.2(f)(10)(ii)(A).[5]  Thereafter, IXC prepared the Petition, seeking to employ Kasilingam as a "Quality Engineer" (CAR 545) from October 1, 2018, to August 29, 2021 (see CAR 549).

In connection with the Petition, IXC submitted a "Labor Condition Application for Nonimmigrant Workers" (the "LCA") to the United States Department of Labor.  (CAR 557-563.)  The LCA

---

        5   The record reflects that, on or around December 2017, Kasilingam submitted a request to extend this employment authorization period from February 2018 to February 2020, pursuant to 8 C.F.R. § 214.2(f)(10)(ii)(C), which authorizes a "24-month extension of post-completion OPT for a science, technology, engineering, or mathematics (STEM) degree," id., provided that such "STEM practical training opportunity . . . be directly related to the degree that qualifies the student for such extension," 8 C.F.R. § 214.2(f)(10)(ii)(C)(4).  (See CAR 572.)  Although the record contains no further information regarding the status of that request, federal regulations automatically extended Kasilingam's employment authorization until October 1, 2018, in conjunction with the Petition.  See 8 C.F.R. § 214.2(f)(5)(vi)(A).  Such extension "automatically terminate[d] upon the . . . [denial] of the H-1B [P]etition filed on [his] behalf," 8 C.F.R. § 214.2(f)(5)(vi)(B). (See also CAR 2 ("This [USCIS denial] decision terminates any employment authorization extension covered under the 'F-1 Cap-Gap' provisions at . . . 8 [C.F.R.] § 214.2(f)(5)(vi).").)

identified the proffered position as a "Quality Engineer," with the "SOC (ONET/OES) code[ of] 15-1199"[6] and the "SOC (ONET/OES) occupation title[ of] Computer Occupations, All Other." (CAR 558.) The Department of Labor certified the LCA on March 13, 2018. (CAR 562.)[7] IXC then tendered to USCIS its Petition, which included the LCA, the H-1B application, and information regarding IXC, Kasilingam, and the Quality Engineer position. (See CAR 542-615.)

As relevant here, IXC's letter in support of the Petition states the following regarding the Quality Engineer position:

> Mr. Kasilingam is being offered temporary employment in the position of Quality Engineer with [IXC] in [its] Apex, North Carolina location. As described below, this position is a "specialty occupation" for which H-1B status is appropriate.
>
> In this position, Mr. Kasilingam will use his knowledge of CAD and mechanical engineering to develop, design, and execute software test plans, scenarios and scripts for [IXC's] CAD-focused software in order to identify software problems and their causes. He will define test parameters, design tests, interpret results, and analyze test trends. He will document defects and report defects to software developers. He will write automated tests using various regression automation suites and test technology. Applying his knowledge of mechanical engineering and CAD, he will participate in product design reviews to provide input on functional requirements, product designs, schedules and potential problems. He will serve as the company's "quality advocate" for his functional component area (mechanical engineering) and will be responsible for documenting software defects, use a defect tracking system, and

---

6    This code encompasses, <u>inter alia</u>, "Software Quality Assurance Engineers and Testers." (CAR 444.)

7    The certification remains valid through August 29, 2021. (<u>Id.</u>)

present his reports regarding defects to the software developers.

Mr. Kasilingam will be responsible for planning test schedules and strategies in accordance with project scope and/or required delivery dates. He will monitor defect resolution efforts and track the progress of resolutions/successes. He will identify, analyze, and document problems with program function, output, online screen, or content. He will also supervise intern employees, as required.

This demanding, professional position qualifies as an occupation for which H-1B status is appropriate, due to the specialized nature of the duties to be performed in this position. For these reasons, [IXC] requires that the individual holding this position possess a Bachelor's degree or higher in Mechanical Engineering, Computer Science or a related technical or engineering field (or the equivalent).

(CAR 594-595.)

USCIS randomly selected the Petition for consideration in the H-1B visa "lottery" (Docket Entry 1, ¶ 22). See Walker Macy LLC v. USCIS, 243 F. Supp.3d 1156, 1163-65 (D. Or. 2017) (discussing relevant selection procedures); see also Registration Requirement for Petitioners Seeking To File H-1B Petitions on Behalf of Cap-Subject Aliens, 84 FR 888-01 (Jan. 31, 2019) (explaining changes in selection process effective April 1, 2019). On August 13, 2018, USCIS issued a "Request for Evidence" (a "RFE") (CAR 531 (emphasis omitted)), explaining that "USCIS[] requires additional evidence to process" IXC's Petition (id.) "and determine whether [IXC] and [Kasilingam] are eligible" for a H-1B visa (CAR 532). (See CAR 531-541.)

IXC timely responded to the RFE, submitting approximately 250 pages of additional information. (See CAR 273-520.) As part of this response, IXC submitted another letter from its founder and CEO, Jeff Cope ("Cope"), regarding IXC, the Quality Engineer position, and Kasilingam's qualifications for that job. In relevant part, the letter explains:

> [IXC] was designed to simplify the process of creating inspection forms and ballooned inspection drawings for first-article and in-process inspections. These reports and drawings are created directly from CAD drawings of just about any file format, including AutoCAD, SolidWorks, and SolidEdge, as well as CAD-neutral raster formats such as PDF and TIFF. [IXC] ha[s] been delivering integrated software solutions for manufacturing and quality inspection since inception and ha[s] a record of five years of high double-digit annual revenue growth. [IXC is] a preferred provider of quality solutions for large OEMs and job shops that extensively use [IXC's] CAD software inspection products across the world. [IXC] currently employ[s] 16 employees at [its] office in Apex, North Carolina and had gross annual sales of approximately $2.5M in 2017.

> Sathish Kasilingam will serve as Quality Engineer (now renamed Quality Engineer-Product Owner) at [IXC]. His position requires knowledge of mechanical engineering and CAD technical expertise, as [IXC] work[s] closely with mechanical engineering drawings in the development of [IXC's] CAD-focused software programs and Mr. Kasilingam is integrally involved in helping design and test [IXC's] CAD-focused inspection products that are used by engineering design teams around the world.

> The percentage of time spent on each day-to-day job duty will vary in response to business needs. In general terms, however, the time can be allocated as follows:

> • Applying knowledge of mechanical engineering and CAD to participate in product design reviews and provide input on functional requirements, product designs, schedules and potential problems. (25%)

- Identify, analyze, and document problems with program function, output, online screen, or content. (20%)
- Serve as the company's "quality advocate" for the mechanical engineering functional component area. (10%)
- Monitor defect resolution efforts and track the progress of resolutions/successes. (10%)
- Supervise intern employees, as required. (10%)
- Document software defects, use a defect tracking system, and present reports regarding defects to the software developers. (8%)
- Define test parameters, design tests, interpret results, and analyze test trends. (5%)
- Write automated tests using various regression automation suites and test technology. (5%)
- Plan test schedules and strategies in accordance with project scope and/or required delivery dates. (5%)
- Develop, design, and execute software test plans, scenarios and scripts for [IXC's] CAD-focused software in order to identify software problems and their causes. (2%)

This is a professional role where the individual must be able to articulate and respond to a variety of engineering and technical inquiries from [IXC's] software developers in addition to suggesting solutions to improve those systems and products. A Bachelor's degree in Mechanical Engineering, Computer Science or a related technical or engineering field will have exposed the individual to the concepts and engineering theories that are required to complete these tasks. Specifically, Mr. Kasilingam obtained the complex knowledge and skills needed to perform this position through the following courses in his Bachelor's and Master's degree programs of study in Mechanical Engineering: . . . .

(CAR 480-481.)

After identifying 53 relevant courses in, _inter alia_, mathematics, mechanical engineering, and computer science, from Kasilingam's academic studies (_see_ CAR 481-483), the letter continues:

The company has not previously hired for the Quality Engineer position offered to Mr. Kasilingam. However, both of the QA interns that currently report to Mr. Kasilingam are in the process of completing their degrees. Specifically, Stephanie Stugg will earn a Bachelor's degree in Industrial and Systems Engineering in December 2018 and Ryan Mee will complete his Master of Computer Science in December 2018. Both of the developers on the team (neither of whom report to Mr. Kasilingam, but with whom Mr. Kasilingam works in close collaboration) possess bachelor's degrees in Information Systems. Consequently, among the members of Mr. Kasilingam's team, a degree requirement in an engineering, computer science, or related technical or engineering occupation is clearly typical. Copies of the resumes of the team members are enclosed. A similar position with the company, QA/QC Team Lead, was posted on Indeed in July 2017 but was not filled. A copy of this posting is also enclosed. As evidenced by the requirements for this position, it is clear that the requirement of a Bachelor's degree in Computer Science, Engineering, or a related technical or engineering field of study for the proffered position is typical within the company for this type of position.

(CAR 483-484.)

Shortly thereafter, USCIS denied the Petition, finding that IXC failed to establish that the Quality Engineer position qualified as a "specialty occupation" (CAR 184), as required for a H-1B visa (see CAR 178). (See CAR 178-184.) IXC then initiated this lawsuit against the Director of USCIS (the "Defendant") under the Administrative Procedure Act (the "APA"), see 5 U.S.C. §§ 701-706, asking the Court to "set aside" that decision. (Docket Entry 1 at 1.) In response, USCIS "reopened Plaintiff's [P]etition and . . . issued a new [RFE]." (Docket Entry 6 at 1; see also CAR 155-164 (containing second RFE).) IXC timely submitted another 110 pages responsive to the second RFE (see CAR 34-144), including two

"expert opinions" (CAR 40) from "Dr. Olga Wodo, Assistant Professor in the Department of Materials Design and Innovation at University of Buffalo-SUNY, Buffalo" ("Dr. Wodo") (CAR 35) and Cope (see CAR 40).

Pertinent to the disputed issues in this case, Cope's nearly thirty-page letter first states:

> This letter is provided to further explain the complexity and uniqueness of the Quality Engineer position at [IXC] and how the nature of the duties is so specialized and complex that it could only be performed by an individual with a bachelor's degree or higher in Mechanical Engineering, Computer Science or a related technical or engineering field. Please note that [Cope is] providing this letter not only in [his] capacity as Founder and Chief Executive Officer of IXC, but also based on [his] expertise in the industry through [his] positions as Member of the International Aerospace Quality Group (IAQG) 9103 Standards Writing Committee, a Member of the American Society for Quality (ASQ), and a Member of the American Society of Mechanical Engineers (ASME). [Cope] ha[s] also been a member of the Dimensional Metrology Standards Consortium (DMSC), a member of the Automotive Industry Action Group (AIAG), and a member of the Quality Information Framework (QIF) Standards writing committee. [Cope is] recognized as an expert in the field given that [he] currently serve[s] on the standards committee for the relevant industry-related professional associations in the field and ha[s] been actively involved in industry-related professional committees and organizations for many years.

> With regard to [IXC's] educational requirements for this position, it is first helpful to understand that [IXC] produces technology products for Quality and Mechanical Engineers working in the manufacturing industry. [IXC's] technology products involve computer-aided design (CAD) programs that are typical of those used in mechanical engineering and are routinely learned as part of a mechanical engineering program. As such, [IXC's] products lie at the intersection of mechanical engineering and computer science and an educational background in one of these fields

> unquestionably provides the theoretical and practica1
> application of a body of highly specialized knowledge
> that is closely related to this position. A further
> description of the position and the link between the
> degree requirements will help elucidate this point.

(CAR 92 (footnotes omitted).) Before beginning his elaboration on the "Position Duties as Set Forth in the Support Letter" (id. (emphasis omitted)), Cope clarified that IXC "also indicated that [it] would accept a 'related technical or engineering degree' for th[e Quality Engineer] position. This was not intended as an open-ended reference to any technical or enginnering degree, but only one that was closely aligned to and provided the same highly specialized educational background as a mechancial engineering or computer science degree." (Id. n.2.)

Cope then addressed each of the duties his previous letters identified for the IXC Quality Engineer position:

> 1. Applying knowledge of mechanical engineering and
> CAD to participate in product design reviews and provide
> input on functional requirements, product designs,
> schedules and potential problems/ Use his knowledge of
> CAD and mechanical engineering to develop, design, and
> execute software test plans, scenarios and scripts for
> [IXC's] CAD-focused software in order to identify
> software problems and their causes.

> [IXC's] software products are InspectionXpert,
> QualityXpert and GageXpert. Courses in mechanical
> engineering provide the fundamental knowledge and
> experience for the Quality Engineer to participate in
> product design reviews. The functional requirements of
> these products requires [sic] an understanding of how the
> manufacturing industry works including common practices
> within manufacturing, as well as how to read and
> interpret blueprints. Knowledge of mechanical
> engineering learned during a mechanical engineering
> degree program enables the Quality Engineer to point out

potential problems that may arise with [IXC's] software requirements or the way that the requirements are understood by [IXC's] software engineers during the review process which greatly benefits [IXC's] software engineering team in developing and refining [IXC's] products. Computer Science knowledge provides the technological underpinnings for the software itself.

In practice, knowledge of the underlying principles of mechanical engineering and computer science enables the Quality Engineer to overhaul the testing done on IXC's products, namely InspectionXpert and QualityXpert. In conjunction with [Cope], the Quality Engineer works on new software application specifications to enhance IXC's manufacturing technology applications. [Cope and the Quality Engineer] also work to create persona documents of all [IXC's] customers, so [they] can understand [their] manufacturing industry customers and think of them while designing new applications.

2. Identify, analyze and document problems with program function, output, online screen or content

Experience with CAD systems and programming learned through a mechanical engineering or computer science program provide the knowledge needed to clearly define the expected output, identify problems in achieving this output and pin-pointing issues to the development team to improve [IXC's] software's performance and usability.

For example, the Quality Engineer assists [IXC] with multiple customers to program out importing templates to work with their Coordinate Measurement Machines (CMM) outputs. CMMs are machines that inspect a manufactured part and assess the quality based on the measurements. All these observations were used as inputs when [IXC] designed a new version of this software in 2018.

In addition, [IXC's] Quality Engineer works with major institutional customers such as Solidworks (a CAD company that offers an inspection solution for manufacturers through IXC) and Net-Inspect (which produces quality improvement software) to ensure the quality and delivery of applications. He regularly tests and checks on the code quality and the user interface quality to the inspection solution that IXC offers for CAD files. He continuously tests and brings up the issues that are to be fixed and prioritized so these

goals can be achieved in tune with the customer's roadmap. Being responsible for the quality of InspectionXpert, the Quality Engineer tracks the parameters that define software quality, namely unit tests percentage, coverity warnings and compiler warnings. He coordinates the effort to make the numbers stay on the decreasing or increasing trend based on the specific parameters.

3. Serve as [IXC's] "quality advocate" for the mechanical engineering functional component area/ Monitor defect resolution efforts and track the progress of resolutions/successes

The Quality Engineer is responsible for informing and educating [IXC] and its representatives about the mechanical engineering terminology that includes manufacturing processes and more, such as programming, electrical control, heat and mass transfer, aerospace concepts, etc.

As a "quality advocate," the Quality Engineer is expected to know the ideal result from the standpoint of the manufacturing teams who will be using [IXC's] technology. The Quality Engineer works with the customers and the development team to make sure that all stakeholders understand the requirements. The Quality Engineer then tracks progress by continuously testing and charting the course of action to fix an issue or create a new feature for [IXC's] manufacturing industry customers.

For example, the Quality Engineer has regular interactions with customers about the issues faced when working on coordinate measurement machines data importing, gages, inspection planning, measurement entry, statistical process control, integrations with enterprise resource planning software or first article inspection software. He works with customers and the software development team to fix these issues. He also works on customer onboarding and adoption being the technical support needed if others at IXC cannot fix the issues faced by [IXC's] customers.

5. Supervise intern employees as required

As a team, IXC's employees are striving hard to fix problems that the manufacturing industry is facing with

respect to quality control.  [IXC's] software is designed
to reduce or eliminate these problems.  The Quality
Engineer is the person who serves as the knowledge base
for the mechanical engineering functional component area
that not only includes manufacturing quality control, but
works with the new interns so they also understand the
common goal of the team.  The Quality Engineer educates
the interns on how [IXC's] technology products for the
manufacturing industry are supposed to work from a
practical engineering perspective. He also serves as the
person to go to when they have questions about the
requirements that they are trying to work on or if they
are facing a blocker.

Under the Quality Engineer's guidance, summer
interns work on systems that report the quality of the
code that is being written at IXC.  He mentors the
incoming Quality Engineers and teaches them how IXC's
products are at the confluence of manufacturing and
information technology with deeper explanations of both
areas.

6. Define test parameters, design tests, interpret
results and analyze test trends

Based on input from customers, sales, marketing,
product management and the development team, the Quality
Engineer prepares the tests that define how the
requirements that were agreed upon are going to be tested
for completion. The Quality Engineer creates the tests
for the software applications based on his knowledge of
best practices in the manufacturing industry and
knowledge of mechanical engineering principles.  Using
this knowledge, the Quality Engineer brainstorms use
cases and use scenarios and makes sure they are included
in the test plans so that when the customer gets the
application and uses it in the company's work
environment, they see what they expect and not errors or
issues.  The testing is done continuously, and trends
documented by the Quality Engineer provide information to
the whole team about the release readiness of the
software application.

7. Write automated tests using various regression
automation suites and test technology

Once a requirement is validated as complete and
after the customer sees the results that they are

expecting, the tests are automated so the team can start working on new requirements.

      8. Responsible for documenting software defects, use a defect tracking system, and present reports regarding defects to the software developers

      The Quality Engineer uses a defect tracking system to communicate to the team at IXC. The system is where all use cases, scenarios and test cases and plans for a requirement are documented. The reports and trends from this defect tracking system are fed back into the process so that the development team and IXC learn from their mistakes.

      9. Responsible for planning test schedules and strategies in accordance with project scope and/or required delivery dates and develop, design and execute software test plans, scenarios and scripts for [IXC's] CAD-focused software in order to identify software problems and their causes

      An important part of the requirements discussion is the schedule and the expected delivery date. The Quality Engineer works to make sure there are near zero defects when the CAD-focused software application is released to the customers of IXC who are across multiple manufacturing sectors like automotive, aerospace, medical, locomotive and more.

(CAR 92-95 (emphasis omitted).)

Next, Cope provided a detailed analysis regarding the connection between the education required for degrees in Mechanical Engineering and Computer Science and the Quality Engineer position at IXC. (See CAR 95-101; see also CAR 95 ("Mechanical engineering provides a background in mathematics, hard sciences, mechanical engineering, and computer science/programming that are all integral to [the Quality Engineer] position."); CAR 99 ("Similarly, a degree in Computer Science provides coursework that is directly related to

the duties and responsibilities of the Quality Engineer role at IXC, as degree programs in this field provide a background in mathematical concepts, engineering, hard sciences, and computing that are essential to this role.").) For example, regarding the mechanical engineering degree, Cope explained, _inter alia_:

> Applied physics — The manufacturing industry's product is completely hardware based and thus there are physics concepts that play a role in the manufacturing process and the resultant quality. An example is the length of a cylindrical bar on a lathe. The machinist must be careful that the rod is the correct length. If the length of the rod exceeds the limit that the lathe can support, the rod will begin to vibrate. This vibration can affect the numerous aspects of the finished part, including radius, dimensions, and surface finish. As such, applied physics helps the Quality Engineer determine how [IXC's] products, InspectionXpert and QualityXpert, can best measure these features to ensure the finished part will be produced as the client wants.

> *******

> Problem solving and C programming — This typical course teaches how to approach problems logically and how to solve them using C programming. The concepts of object-oriented programming, computer architecture and the fundamental concepts of programming provide a Quality Engineer working on mechanical engineering software for a manufacturing industry customer the ability to understand the reality of requirements and how they can be achieved.

> *******

> Materials science — Metals, plastics, composites, salts, gases, surfactants, coolants and more are certain categories of materials. The list can be extensive. The materials information is most likely on the part model or drawing or in an attached documentation when an IXC customer receives an order. As the company's "quality advocate" for the mechanical engineering functional component area, the Quality Engineer must understand when customers refer to different materials and how this

impacts their manufacturing processes. Quality errors can lead to scrapping a part which leads to a waste of material and is costly.

*******

Value analysis and value engineering — Prioritization of requirements and understanding the value that each requirement, issue or request has helps determine the value and how to engineer the product to be manufactured so that the most valuable issues are solved alongside providing the most appreciated requirements. The Quality Engineer prioritizes use cases and scenarios and addresses the most valuable ones first.

Computer aided engineering & Finite element analysis — InspectionXpert is a software application that helps Quality Engineers in the manufacturing industry. It is a computer aided engineering product. Finite element analysis provides a different perspective into how different computer aided engineering products can work. This course helps a Quality Engineer understand the varied applications that a customer might be using and how they expect functionality to work in computer aided engineering applications.

*******

(CAR 96-99 (emphasis omitted).)

As for the Computer Science Degree, Cope related, for instance:

C and Software Tools & Data Structures for Computer Science: Provides knowledge of object-oriented programming, computer architecture and the fundamental concepts of programming that provide a Quality Engineer working on software for a manufacturing industry customer the ability to understand the reality of requirements and how they can be achieved.

Elementary Linear Algebra: Provides the Quality Engineer with the mathematical understanding needed to solve fundamental concepts of machine learning and statistical classification procedures for gathering inferential data from measurements or other quality metrics in a manufacturing process.

16

*******

Operating Systems for CSC:  Provides the knowledge
of  operating  systems,  process  management,  memory
addressing  and  allocation,  files  and  protection,
deadlocks and distributed systems, etc. that are used by
Software  Engineers  in  the  design  process  of  [IXC's]
software  and  which  must  be  understood  by  the  Quality
Engineer to understand how the software operates in these
systems.

Probability  &  Statistics  for  Eng[inee]rs:
InspectionXpert  and  QualityXpert  are  for  quality
professionals in the manufacturing industry.  This course
contained  the  concepts  of  sampling,  quality  control  and
assurance,  machine  qualification  and  the  underlying
mathematical  concepts  like  the  operating  characteristic
curve  and  more.   Gages,  CMMs,  optical  stationary
scanners,  and laser based portable  scanners are some of
the  devices  that  can  be  used  to  measure  quality  in  the
manufacturing industry.  This course involves the ways to
use  these  devices,  how  to  measure  quality  of  a
manufactured part, and how to calibrate and standardize
the process of measurement.

*******

Software  Engineering:   Application  of  software
engineering  methods  to  develop  complex  products,
including  quality  assurance,  project  management,
requirements  analysis,  specifications,  design,
development,  testing,  production,  maintenance,  etc.
InspectionXpert  is  a  software  application  that  helps
quality engineers in the manufacturing industry.  It is
a computer aided engineering product.  This course helps
a Quality Engineer understand the varied application that
a  customer  might  be  using  and  how  they  expect
functionality  to  work  in  computer  aided  engineering
applications

*******

(CAR 99-101.)[8]

---

8  Cope also identified certain courses common to each degree
program, such as calculus.  (See CAR 96-101.)

Cope further stated:

     In short, as mentioned above, the position of Quality Engineer involves a confluence of computer science and mechanical engineering, as [IXC's] products are engineering software products used by mechanical and quality engineers in the manufacturing process. The position involves proving a concept of automatic inspection report generation from an image-based drawing, typical to those found in a mechanical engineering program, as well as coding an algorithm to extract and annotate the required regions on a CAD drawing so customers can focus on those annotations for inspection of the geometry of the manufactured part, as is typical of a computer science program. Therefore, a degree in mechanical engineering or computer science is clearly directly related to the position duties and someone without a degree in one of those fields (or a closely related field) would be unable to perform the complex mechanical engineering and computer-science focused duties required by this position.

     Examples of Mr. Kasilingam's work in the position of Quality Engineer are attached as further evidence of the highly specialized and complex nature of the duties required by this position. Therefore, as demonstrated clearly above, a degree in Computer Science, Mechanical Engineering or a closely related technical or engineering degree is essential to perform the specialized and complex duties required of the Quality Engineer.

(CAR 101-102.) Cope ended with various exemplars of Kasilingam's work, as well as detailed explanations accompanying the various diagrams, screenshots, and tables. (CAR 103-120.)

In addition, IXC submitted a "Professional Position Evaluation report" by Dr. Wodo. (See CAR 45-56.) This report likewise "conclude[s] that the position [of Quality Engineer at IXC] is so complex and specialized that only an individual with a bachelor's degree in Mechanical Engineering, Computer Science or equivalent

18

could adequately perform the complex responsibilities." (CAR 45; see generally CAR 45-47.)

USCIS thereafter again denied the Petition. (See CAR 15-23 (the "Decision").) In relevant part, the USCIS Decision states:

> The only issue to be discussed is whether the position offered to [Kasilingam] qualifies as a specialty occupation.

> INA § 214(i)(1) defines "specialty occupation" as follows, in relevant part:

> ... the term "specialty occupation" means an occupation that requires -

> (A) theoretical and practical application of a body of highly specialized knowledge, and

> (B) attainment of a bachelor's or higher degree in the specific specialty (or its equivalent) as a minimum for entry into the occupation in the United States.

> 8 CFR § 214.2(h)(4)(ii) defines a specialty occupation to mean:

> ... an occupation which requires theoretical and practical application of a body of highly specialized knowledge in fields of human endeavor including, but not limited to, architecture, engineering, mathematics, physical sciences, social sciences, medicine and health, education, business specialties, accounting, law, theology, and the arts, and which requires the attainment of a bachelor's degree or higher in a specific specialty, or its equivalent, as a minimum for entry into the occupation in the United States.

> Pursuant to 8 CFR § 214.2(h)(4)(iii)(A), to qualify as a specialty occupation, the position must meet one of the following criteria:

> (1) A baccalaureate or higher degree or its equivalent is normally the minimum requirement for entry into the particular position;

(2) The degree requirement is common to the industry in parallel positions among similar organizations or, in the alternative, an employer may show that its particular position is so complex or unique that it can be performed only by an individual with a degree;

(3) The employer normally requires a degree or its equivalent for the position; or

(4) The nature of the specific duties are so specialized and complex that knowledge required to perform the duties is usually associated with the attainment of a baccalaureate or higher degree.

A specialty occupation is defined as one that requires the theoretical and practical application of a body of highly specialized knowledge and the attainment of a bachelor's or higher degree in the specific specialty (or its equivalent) as a minimum for entry into the occupation in the United States. The regulations at 8 CFR § 214.2(b)(4)(iii)(A) further clarify how a position can qualify as a specialty occupation. However, it should be noted that 8 CFR § 214.2(h)(4)(iii)(A) must logically be read together with INA § 214(i)(1) and 8 CFR § 214.2(h)(4)(ii). Hence, the criteria stated in 8 CFR § 214.2(h)(4)(iii)(A) should logically be read as being necessary but not necessarily sufficient to meet the statutory and regulatory definition of specialty occupation. To otherwise interpret this section as stating the necessary and sufficient conditions for meeting the definition of specialty occupation would result in particular positions meeting a condition under 8 CFR § 214.2(h)(4)(iii)(A) but not the statutory or regulatory definition. To avoid this illogical result, 8 CFR § 214.2(h)(4)(iii)(A) must therefore be read as providing supplemental criteria that must be met in accordance with, and not as alternatives to, the statutory and regulatory definitions of specialty occupation. As such and consistent with INA § 214(i)(1) and the regulation at 8 CFR § 214.2(h)(4)(ii), USCIS consistently interprets the term "degree" in the criteria at 8 CFR § 214.2(h)(4)(iii)(A) to mean not just any bachelor's or higher degree, but one in a specific specialty that is directly related to the proffered position. Applying this standard, USCIS regularly approves H-1B petitions for qualified nonimmigrants who are to be employed as engineers, computer scientists,

certified public accountants, college professors, and other such occupations. These professions, for which petitioners have regularly been able to establish a minimum entry requirement in the United States of a bachelor's or higher degree in a specific specialty or its equivalent directly related to the duties and responsibilities of the particular position, fairly represent the types of specialty occupations that Congress contemplated when it created the H-1 B visa category.

*******

Each position is evaluated based upon the nature and complexity of the actual job duties to be performed with that specific employer. . . . Through detailed descriptions of the beneficiary's duties, USCIS may discern the nature of the position and whether the position requires the theoretical and practical application of a body of highly specialized knowledge attained through attainment of at least a bachelor's degree or higher in a specific discipline.

*******

[IXC] described the duties of the proffered position as follows:

• Applying knowledge of mechanical engineering and CAD to participate in product design reviews and provide input on functional requirements, product designs, schedules and potential problems 25%
• Identify, analyze and document problems with program function, output, online screen or content 20%
• Serve as the company's "quality advocate" for the mechanical engineering functional component area 10%
• Monitor defect resolution efforts and track the progress of resolutions/successes 10%
• Supervise intern employees as required 10%
• Define test parameters, design tests, interpret results and analyze test trends 5%
• Write automated tests using various regression automation suites and test technology 5%
• Responsible for documenting software defects, use a defect tracking systems, and present reports

regarding defects to the software developers 5%; [sic]
• Responsible for planning test schedules and strategies in accordance with project scope and/or required delivery dates 5%
• Document defects and report defects to software developers 3%
• Develop, design and execute software test plans, scenarios and scripts for [IXC's] CAD-focused software in order to identify software problems and their causes 2%

First, the duties as described do not establish the depth, complexity, level of specialization, or substantive aspects of the duties for which the beneficiary would be responsible. [IXC] described the duties of the proffered position in relatively generalized and abstract terms that do not relate substantial details about either the position or its constituent duties. For example, the above duties do not provide details regarding the beneficiary's specific role in the duties to "[apply] knowledge of mechanical engineering and CAD to participate in product design reviews ... ", and "[s]erve as the company's 'quality advocate' for the mechanical engineering functional component area." [IXC] did not further elaborate on the specific tasks, methodologies and applications of knowledge that would be required in furtherance of these overarching duties. Terms such as "apply," "identify," and "define" provide little insight into [Kasilingam's] specific role within these tasks. This type of generalized description may be appropriate when defining the range of duties that may be performed within an occupational category, but it does not adequately convey the substantive work that [Kasilingam] will perform. Without a meaningful job description, the record lacks evidence sufficiently concrete and informative to demonstrate that the proffered position requires a specialty occupation's level of knowledge in a specific specialty. The duties as described do not communicate: (1) the actual work that the beneficiary would perform; (2) the complexity, uniqueness and/or specialization of the duties; or (3) the correlation between that work and a need for a particular level education of highly specialized knowledge in a specific specialty. Thus, [IXC] ha[s] not shown that the proffered position is a specialty occupation and the petition must be denied on this basis alone.

Nevertheless, USCIS will analyze the duties as described and the evidence of record to determine whether the proffered position as described would qualify as a specialty occupation. When attempting to establish whether the position is a specialty occupation, [IXC] must show that the position meets at least one of four criteria at 8 CFR § 214.2(h)(4)(iii)(A). . . .

(CAR 16-19 (bullet points and certain ellipses and brackets in original).)

The Decision then addresses each of the four regulatory criteria at 8 C.F.R. § 214.2(h)(4)(iii)(A). (See CAR 19-23.) In regard to the first criterion, that "[a] baccalaureate or higher degree or its equivalent is normally the minimum requirement for entry into the particular position," 8 C.F.R. § 214.2(h)(4)(iii)(A)(1), the Decision first notes that the LCA identifies the proffered position in the "Computer Occupations, All Other category" of the Occupational Outlook Handbook (the "OOH"). (CAR 19.) Because the OOH does not contain sufficient details regarding this category to establish that the position qualifies as a speciality occupation, the Decision states, "it is [IXC's] responsibility to provide probative evidence (e.g., documentation from other objective, authoritative sources) that supports a finding that the particular position qualifies as a specialty occupation." (Id.)

At that point, the Decision turns to two of the three career resource guides that IXC submitted. (See CAR 19-20 (discussing "DOL's O*Net Online website" and "www.thebalancecareers.com"); see

23

also CAR 70-71, 449-452 (containing information from CareerOneStop, which "is sponsored by the U.S. Department of Labor, Employment and Training Administration" (CAR 71)).)[9]  Per the Decision, the relevant O*NET job zone designation "indicates that a position requires considerable preparation," but "does not . . . demonstrate that a bachelor's degree in any specific specialty is required, and does not, therefore, demonstrate that a position so designated is a specialty occupation." (CAR 19.)  After addressing the O*NET information, the Decision states:

> Additionally, [IXC] cited www.thebalancecareers.com for the educational requirements for a Software Quality Assurance (QA) Engineer.  Although the website indicates that jobs in this field usually require at least a bachelor's or master's degree in software design, engineering, or computer science, the website goes on to say that approximately 70% of those working as QA engineers have at least a bachelor's degree.  Also as stated above, the website indicates that the duties of a Software Quality Assurance (QA) Engineer can be performed by an individual with a bachelor's degree or higher in engineering.  The issue here is that the field of engineering is a broad category that covers numerous and various specialties, some of which are only related through the basic principles of science and mathematics, e.g., nuclear engineering and aerospace engineering. Thus, a general degree in engineering or one of its other subspecialties, such as civil engineering or industrial engineering, is not closely related to mechanical engineering.  Furthermore, www.thebalancecareers.com is not considered an authoritative source that USCIS uses to determine specialty occupation.

---

9 Although the Decision acknowledges that IXC submitted "[a]n Occupational Profile from careeronestop.org for Software Quality Assurance Engineers and Testers" (CAR 17), it does not analyze or further address the CareerOneStop information, instead limiting its assessment to the information from O*NET and The Balance Careers (see CAR 17-23).

As such, [IXC] ha[s] not sufficiently established that a bachelor's degree or higher in a specific specialty, or its equivalent, is normally the minimum requirement for entry into the particular position.

(CAR 19-20.)

The Decision next discusses the second criterion, that "[t]he degree requirement is common to the industry in parallel positions among similar organizations or, in the alternative, . . . [the employer's] particular position is so complex or unique that it can be performed only by an individual with a degree," 8 C.F.R. § 214.2(h)(4)(iii)(A)(2), in two parts. In regard to "th[e] first alternative prong" (CAR 20), the Decision notes that IXC "submitted four job postings," a "QA Engineer - CAD Integration" position at "ESRI," a "CAD Software Tester" at "EG Life Sciences/Eliassen," another "CAD Software Tester" at "Eliassen," and a "Test Development Engineer at Jabil Circuit" at "Nypro Healthcare" (id.). Per the Decision, the ESRI position required a "[b]achelor's or master's in computer science, mathematics, GIS, or a related field, depending on position level," whereas the CAD Software Tester positions required a "[d]egree in Mechanical Engineering," and the Nypro Healthcare position required a "bachelor[']s degree . . . in an engineering discipline from a college or university related to a technology field." (Id.) According to the Decision:

[W]hile ESRI specifies specific specialties, they do not limit the field of study to a particular subject that may be appropriate to the proffered position, but allow for a wide variety of fields to include computer science, mathematics, GIS, or a related field. Nypro Healthcare

25

allows an engineering discipline related to a technology field, but does not specify a required specific specialty. Finally, EG Life Sciences and Eliassen both list the following identical job requirements[,] . . . . [which] appear to be more advanced or at higher levels than the duties of the proffered position. For instance, EG Life Sciences and Eliassen require "in-depth" and "extensive" knowledge and experience with CAD tools, while [IXC] only require[s] "knowledge of mechanical engineering and CAD ..." Additionally, one of the duties of the proffered position is "write automated tests...," while EG Life Sciences and Eliassen require "strong" technical report writing skills. Thus, it appears that the position at EG Life Sciences and/or Eliassen is more advanced than the proffered position.

As such, you have not shown that the degree requirement is common to the industry in parallel positions among similar organizations.

(CAR 21 (final two ellipses in original).)

As to the second alternative prong, the Decision addresses the Cope and Wodo letters submitted in response to the second RFE, as follows:

The first letter, written by [IXC's] founder, Mr. Jeffrey M. Cope, contains a breakdown of the job duties for the proffered position. However, the breakdown provides no relevant details as to the unique or complex nature of the proffered position. For instance, in explaining the beneficiary's duty to "supervise intern employees as required," Mr. Cope merely states that the beneficiary is expected to "work with" summer interns so that they "understand the common goal of the team." Mr. Cope does not elaborate on how the beneficiary will "work with" these interns, or why he believes explaining the company's goals to summer interns requires a baccalaureate degree or higher. Additionally, Mr. Cope's letter states that the beneficiary works with customers, such as Solidworks and Net-Inspect; however, the record does not contain sufficient evidence of valid contractual arrangements between [IXC] and these two clients to adequately substantiate [IXC's] claims regarding the beneficiary's job assignment. As such, the letter from Mr. Cope is not viewed as sufficient to establish that

the proffered position is more unique or complex than other similar positions within the same industry.

Next, [USCIS] will discuss the letter from Dr. Olga Wodo. First, [USCIS] observe[s] that Dr. Wodo does not discuss the duties of the proffered position in any substantive detail. Rather, she restates the same duties listed in [IXC's] position description. Also, Dr. Wodo does not discuss the duties in the specific context of [IXC's] business, or any particular project to which the beneficiary will be assigned. Thus, her level of familiarity with the actual job duties as they will be performed in the context of [IXC's] business is questionable. That is, there is no indication that she possesses any knowledge of the proffered position beyond [IXC's] job description.

Therefore, USCIS questions the basis of Dr. Wodo's ultimate conclusion about the minimum educational requirement for this particular position. Moreover, the record does not include any relevant research, studies, surveys, or other authoritative publications as part of her review or as a foundation for her opinion.

USCIS may use as advisory opinion statements submitted as expert testimony. However, where an opinion is not in accord with other information or is in any way questionable, USCIS is not required to accept or may give less weight to that evidence. *Matter of Caron International*, 19 I&N Dec. 791 (Comm'r 1988). Thus, USCIS discounts the advisory opinion as not probative of any criterion of 8 CFR § 214.2(h)(4)(iii)(A).

As such, [IXC] ha[s] not shown that this position involves duties seen as either unique or complex so that only an individual with a bachelor's degree or higher in a specific specialty could perform them.

(CAR 22.)

As for the third criterion, that "[t]he employer normally requires a degree or its equivalent for the position," 8 C.F.R. § 214.2(h)(4)(iii)(A)(3), the Decision concludes that, because IXC has "never previously hired anyone for the proffered position," IXC

could not satisfy that standard. (CAR 22.) Finally, regarding the fourth criterion, that "[t]he nature of the specific duties are so specialized and complex that knowledge required to perform the duties is usually associated with the attainment of a baccalaureate or higher degree," 8 C.F.R. § 214.2(h)(4)(iii)(A)(4), the Decision states:

> In response to this prong, [IXC] ha[s] again advised USCIS to "[p]lease see the attached letter and documents from Jeffrey Cope ..." and to "[s]ee also Letter from Dr. Wodo ..." As USCIS has already discussed these two letters at length, they will not be addressed again at this time.

> For the same reasons described under prong 2b, the letters from Jeffrey Cope and Dr. Wodo fail to demonstrate that this position involves duties seen as either unique or complex so that only an individual with a bachelor's degree or higher in a specific specialty could perform them.

> As such, [IXC] ha[s] not shown that the nature of the specific duties is so specialized and complex that knowledge required to perform the duties is usually associated with the attainment of a bachelor's or higher degree.

(CAR 23 (ellipses in original).)

The Decision concludes by denying the Petition. (See id.) Plaintiff then filed an amended complaint challenging the Decision. (See, e.g., Docket Entry 12, ¶¶ 74-76, 89.) The parties thereafter filed cross-motions for summary judgment (Docket Entries 17, 19), alternatively seeking to overturn and uphold the Decision (see, e.g., Docket Entry 18 at 1 ("[T]here is no basis for overturning [the D]ecision . . . ."); Docket Entry 19 at 1 ("[T]his Court

28

should . . . set aside the final agency action[] and order the Agency to adjudicate the [P]etition anew in compliance with law.").)

**DISCUSSION**

## I. Governing Standards

"Relevant here, the APA authorizes a court to set aside an agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Perez v. Cuccinelli, No. 18-1330, __ F.3d __, __, 2020 WL 611530, at *5 (4th Cir. Feb. 10, 2020) (en banc) (quoting 5 U.S.C. § 706(2)(A)).[10]  In reviewing an agency action, the Court "shall decide all relevant

---

10  More specifically, the APA authorizes the Court to

hold unlawful and set aside agency action, findings, and conclusions found to be —

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence . . .; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

5 U.S.C. § 706(2).

questions of law[ and] interpret constitutional and statutory provisions." 5 U.S.C. § 706; see also Perez, __ F.3d at __, 2020 WL 611530, at *5 ("Because USCIS denied [the plaintiff's immigration] application on the basis of the Agency's interpretation of [a statute], [the Court] must decide whether that interpretation is 'not in accordance with law,' bearing in mind that it is [the Court's] duty under the APA to 'decide all relevant questions of law' and to 'interpret constitutional and statutory provisions.'").

Moreover, "[i]n determining whether agency action was arbitrary or capricious, the [C]ourt must consider whether the agency considered the relevant factors and whether a clear error of judgment was made." Ohio Valley Envtl. Coal. v. Aracoma Coal Co., 556 F.3d 177, 192 (4th Cir. 2009); see also Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) ("Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."). "Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The [C]ourt is not empowered

to substitute its judgment for that of the agency." <u>Ohio Valley</u>, 556 F.3d at 192 (internal quotation marks omitted). However, "[t]he 'arbitrary and capricious' standard is not meant to reduce judicial review to a 'rubber-stamp' of agency action. While the standard of review is narrow, the [C]ourt must nonetheless engage in a 'searching and careful' inquiry of the record." <u>Id.</u> (citation omitted); <u>see also</u> <u>id.</u> (noting that "[d]eference is due" only where, <u>inter alia</u>, "the agency has examined the relevant data").

## II. The H-1B Regulation

### A. The Parties' Positions

The parties' dispute centers around the correct interpretation of a provision within 8 C.F.R. § 214.2(h)(4) (the "H-1B Regulation"), namely 8 C.F.R. § 214.2(h)(4)(iii)(A) (the "Provision"), which provides the "[c]riteria for H-1B petitions involving a specialty occupation," 8 C.F.R. § 214.2(h)(4)(iii). More specifically, the parties differ in their interpretation of the appropriate "[s]tandards for [a] specialty occupation position," 8 C.F.R. § 214.2(h)(4)(iii)(A). (<u>Compare</u> Docket Entry 20 at 9 ("The Agency's interpretation — and [the D]ecision based thereon — is unlawful and contrary to law because it defies the plain, unambiguous language of § 214.2(h)(4)(iii)(A)."), <u>with</u> Docket Entry 18 at 9 n.5 ("Th[e specified] criteria must be read together with the statutory and regulatory definition of 'specialty occupation.' As such, USCIS interprets the term 'degree' to mean

not just *any* bachelor's or higher degree, but one in a *specific specialty* that is directly related to the proffered position." (emphasis in original)). Pursuant to the Provision,

> To qualify as a specialty occupation, the position must meet one of the following criteria:
>
> > (1) A baccalaureate or higher degree or its equivalent is normally the minimum requirement for entry into the particular position;
> >
> > (2) The degree requirement is common to the industry in parallel positions among similar organizations or, in the alternative, an employer may show that its particular position is so complex or unique that it can be performed only by an individual with a degree;
> >
> > (3) The employer normally requires a degree or its equivalent for the position; or
> >
> > (4) The nature of the specific duties are so specialized and complex that knowledge required to perform the duties is usually associated with the attainment of a baccalaureate or higher degree.

8 C.F.R. § 214.2(h)(4)(iii)(A).

According to the Decision, the Provision "clarif[ies] how a position can qualify as a specialty occupation," and "must logically be read together with INA § 214(i)(1) and 8 CFR § 214.2(h)(4)(ii)" to avoid the "illogical result" of "particular positions meeting a condition under [the Provision] but not the statutory or regulatory definition [of specialty occupation]." (CAR 16.) "As such and consistent with INA § 214(i)(1) and the regulation at 8 CFR § 214.2(h)(4)(ii)," the Decision states,

> USCIS consistently interprets the term "degree" in the criteria at 8 CFR § 214.2(h)(4)(iii)(A) to mean not just

any bachelor's or higher degree, but one in a specific specialty that is directly related to the proffered position. Applying this standard, USCIS regularly approves H-1B petitions for qualified nonimmigrants who are to be employed as <u>engineers</u>, <u>computer scientists</u>, certified public accountants, college professors, and other such occupations. <u>These professions</u>, for which petitioners have regularly been able to establish a minimum entry requirement in the United States of a bachelor's or higher degree in a specific specialty or its equivalent directly related to the duties and responsibilities of the particular position, <u>fairly represent the types of specialty occupations that Congress contemplated when it created the H-1 B visa category</u>.

(CAR 16-17 (emphasis added).)

Notwithstanding the foregoing, the Decision further reveals that, rather than requiring a degree in a "specific specialty," it interprets the Provision to require a degree in a specific "subspecialt[y]" (CAR 19). For instance, in rejecting Plaintiff's evidence in support of the first criterion, the Decision states:

> [T]he website indicates that the duties of a Software Quality Assurance (QA) Engineer can be performed by an individual with a bachelor's degree or higher in engineering. The issue here is that the field of engineering is a broad category that covers numerous and various specialties, some of which are only related through the basic principles of science and mathematics, e.g., nuclear engineering and aerospace engineering. Thus, a general degree in engineering or one of its other <u>subspecialties</u>, such as civil engineering or industrial engineering, is not closely related to mechanical engineering.

(Id. (emphasis added); accord CAR 10 (same).)[11]  Similarly, in analyzing Plaintiff's evidence regarding the second criterion, the Decision rejects evidence as to Nypro Healthcare on the ground that "Nypro Healthcare allows an engineering discipline related to a technology field, but does not specify a required specific specialty." (CAR 21.)

IXC disputes this interpretation of the Provision. (See, e.g., Docket Entry 20 at 10 ("Nowhere in the [underlying] statute does it require the degree to come solely from one particular academic discipline." (internal quotation marks omitted).) According to IXC, the Decision's interpretation of the Provision cannot survive review under the Supreme Court's recent decision in Kisor v. Wilkie, __ U.S. __, 139 S. Ct. 2400 (2019), which "instructs courts to look to the text, structure, and history of a regulation to determine whether it is unambiguous.  If the regulation is unambiguous, courts should not defer to an [a]gency interpretation; instead, courts should apply the unambiguous meaning." (Docket Entry 20 at 10-11 (citing Kisor, __ U.S. at __, 139 S. Ct. at 2415).)

In that regard, IXC argues that

the text, structure, and history of 8 C.F.R. § 214.2(h)(4)(iii)(A) demonstrate that the Agency's

_____

11 Defendant does not account for the above-quoted portion of the Decision in arguing that "USCIS did not require one specific degree; it simply stated that the degree could not be a 'general degree'" (Docket Entry 22 at 10 (quoting "(CAR 10.)").

interpretations of "degree" . . . in
§ 214.2(h)(4)(iii)(A)(1) [is] not entitled to deference
and is, in fact, unlawful. First, the relevant text of
this [Provision] is unambiguous. In fact, the [A]gency
identifies [it] as such in its adjudicator's field manual
by noting that the [Provision] clearly and "precisely"
informs petitioners of the exact documentation required
for approval of an H-1B. It is no surprise that the
term[] "a baccalaureate or higher degree" . . . [is]
unambiguous. Courts often look to dictionary definitions
to determine whether a particular term is ambiguous.
Here, a "baccalaureate degree" is defined as "the degree
of bachelor conferred by universities and colleges." A
degree "higher" than that of a baccalaureate would be a
master's or doctorate.

(Docket Entry 20 at 11-12 (citations, brackets, and footnote omitted).)

Defendant responds that "IXC's interpretation of the [Provision] would allow employers to ensure the receipt of a visa just by including a generic degree requirement." (Docket Entry 22 at 8.) In Defendant's view, "USCIS's interpretation of the [Provision's] degree requirement, namely that the degree must be in a specific specialty . . . is reasonable and entitled to deference." (Id. (citing CAR 10-11); see also id. at 9 ("Defendant therefore respectfully requests that the Court apply Auer deference to USCIS's reasonable interpretation of 8 C.F.R. § 214.2(h)(4)(iii)(A)(1).").)[12]

_____

12 "Auer deference" refers to the practice of "defer[ring] to agencies' reasonable readings of genuinely ambiguous regulations." Kisor, __ U.S. at__, 139 S. Ct. at 2408.

## B.  Interpretative Standards

As the Supreme Court recently explained:

> [A] court should not afford *Auer* deference unless the
> regulation is genuinely ambiguous.  *See Christensen v.
> Harris County*, 529 U.S. 576, 588 (2000); [*Bowles v.*]
> *Seminole Rock* [*& Sand Co.*], 325 U.S. [410,] 414 [(1945)]
> (deferring only "if the meaning of the words used is in
> doubt").  If uncertainty does not exist, there is no
> plausible reason for deference. The regulation then just
> means what it means — and the court must give it effect,
> as the court would any law.  Otherwise said, the core
> theory of *Auer* deference is that sometimes the law runs
> out, and policy-laden choice is what is left over. *See
> supra*, at 2412 - 2413.  But if the law gives an answer —
> if there is only one reasonable construction of a
> regulation — then a court has no business deferring to
> any other reading, no matter how much the agency insists
> it would make more sense.  Deference in that circumstance
> would "permit the agency, under the guise of interpreting
> a regulation, to create *de facto* a new regulation." *See
> Christensen*, 529 U.S. at 588.

Kisor, __ U.S. at __, 139 S. Ct. at 2415 (parallel citations
omitted).  Moreover, if, after employing "the 'traditional tools'
of construction," id. at __, 139 S. Ct. at 2415, the regulation
remains genuinely ambiguous, "the agency's reading must still be
'reasonable.'  In other words, it must come within the zone of
ambiguity the court has identified after employing all its
interpretive tools." Id. at __, 139 S. Ct. at 2415-16 (citation
omitted).[13]  Further, "not every reasonable agency reading of a
genuinely ambiguous rule should receive *Auer* deference.  [Rather,]
in applying *Auer*[,] . . . a court must make an independent inquiry

---

13  In this analysis, "[t]he text, structure, history, and so
forth . . . establish the outer bounds of permissible
interpretation."  Id. at __, 139 S. Ct. at 2416.

into whether the character and context of the agency interpretation entitles it to controlling weight." Id. at __, 139 S. Ct. at 2416.

For instance, to receive Auer deference, "the regulatory interpretation must be one actually made by the agency. In other words, it must be the agency's 'authoritative' or 'official position,' rather than any more ad hoc statement not reflecting the agency's views." Id. at __, 139 S. Ct. at 2416. Further, "[t]he interpretation must at the least emanate from those actors, using those vehicles, understood to make authoritative policy in the relevant context." Id. at __, 139 S. Ct. 2416. "Finally, an agency's reading of a rule must reflect 'fair and considered judgment' to receive Auer deference." Id. at __, 139 S. Ct. at 2417. More specifically:

> [A] court should decline to defer to a merely "convenient litigating position" or "post hoc rationalizatio[n] advanced" to "defend past agency action against attack." And a court may not defer to a new interpretation, whether or not introduced in litigation, that creates "unfair surprise" to regulated parties. That disruption of expectations may occur when an agency substitutes one view of a rule for another. [The Supreme Court has] therefore only rarely given Auer deference to an agency construction "conflict[ing] with a prior" one. Or the upending of reliance may happen without such an explicit interpretive change. Th[e Supreme] Court, for example, recently refused to defer to an interpretation that would have imposed retroactive liability on parties for longstanding conduct that the agency had never before addressed.

Id. at __, 139 S. Ct. at 2417-18 (citations and footnote omitted) (second and fourth set of brackets in original).

## C.  Relevant History

The immigration statutes have authorized "'H' visas . . . since 1952." <u>Walker Macy</u>, 243 F. Supp. 3d at 1162.  "In 1970, the Immigration and Nationality Act [(the "INA")] was amended" to authorize visas for certain temporary workers, <u>Matter of Caron</u>, 19 I. & N. Dec. at 792, including "'(H) an alien having a residence in a foreign country which he has no intention of abandoning (i) who is of distinguished merit and ability and who is coming temporarily to the United States to perform services of an exceptional nature requiring such merit and ability,'" <u>Matter of Essex Cryogenics Indus., Inc.</u>, 14 I. & N. Dec. 196, 197 (BIA 1972) (quoting INA § 101(a)(15)(H)).  As of 1972, the forerunner to USCIS (the "Service") "ha[d] long held that a person who is qualified as a member of the professions qualifies as a person 'of distinguished merit and ability' as that term is used in section 101(a)(15)(H)(i)." <u>Id.</u>[14]

---

[14]  As here, the <u>Essex</u> decision involved an individual who entered the United States as a nonimmigrant student to pursue mechanical engineering degrees.  After he obtained his master's degree in mechanical engineering, the Service authorized him "to accept employment for practical training in his field of study and he took such training with [Essex Cryogenics Industries]," <u>id.</u> at 196, which thereafter petitioned the Service to classify him as a H-1B immigrant, so that he could continue working for the company. <u>See</u> <u>id.</u> at 196-97.  Finding that the individual "by virtue of his education as a mechanical engineer is a member of the professions" and that the company intended to continue employing him as an engineer, a capacity "which requires a person of [his] training and experience," <u>id.</u> at 197, the Service approved his "'H-1' classification," <u>id.</u>; <u>see</u> <u>id.</u> at 196, 198.

Further, since at least 1965, the INA has provided that "[t]he term 'profession' shall include but not be limited to architects, engineers, lawyers, physicians, surgeons, and teachers in elementary or secondary schools, colleges, academies, or seminaries." Act of Oct. 3, 1965, PL 89-236, 79 Stat. 911, 917; see also 8 U.S.C. § 1101(a)(32) (same). Building upon this statutory provision, in January 1966, the Matter of Shin, 11 I. & N. Dec. 686 (BIA 1966), "set forth" for immigration purposes "[t]he basic definition of 'profession,'" which "has been followed ever since." Temporary Alien Workers Seeking Classification Under the Immigration and Nationality Act, 51 FR 28576-03, 28578 (proposed Aug. 8, 1986) (the "1986 Proposal"). This decision explained that "[t]he word 'profession' . . . implies professed attainments in special knowledge as distinguished from mere skill." Matter of Shin, 11 I. & N. Dec. at 687. In other words, "it refers to a status which requires knowledge of an advanced type in a given field of science or learning gained by a prolonged course of specialized instruction and study." Id. A "common denominator" among the vocations named in the INA as professions "is the fact that all require specialized training that is normally attained through high education of a type for which at least a bachelor's degree can be obtained, or through equivalent specialized instruction and experience in lieu thereof." Id. Notably, "the vocations included in the term 'profession' in our modern highly

industrialized society are constantly expanding, consistent with the greater knowledge and specialized training that such a society demands." Id. Yet, "[t]he mere acquisition of a degree or equivalent experience does not, of itself, qualify a person as a member of a 'profession.' [Rather, t]he knowledge acquired must also be of nature that is a realistic prerequisite to entry into the particular field of endeavor." Id. at 688.[15]

In 1986, the Service issued a proposed rule designed "to establish realistic standards for determining who qualifies as an alien of distinguished merit and ability for H-1 classification. In this respect, the rule would define profession and list the eligibility criteria for a number of the professions . . . ." 1986 Proposal, 51 FR 28576-03, at 28576. Noting that "aliens who are members of the professions within the meaning of [8 U.S.C. § 1101(a)(32)] are classifiable as aliens of distinguished merit and ability," 1986 Proposal, 51 FR 28576-03, at 28578, the Service explained that the proposed "rule would set forth the definition of

---

15 This distinction reoccurs in later decisions and rules. See, e.g., Temporary Alien Workers Seeking Classification Under the Immigration and Nationality Act, 55 FR 2606-01, at 2609 (Jan. 26, 1990) (the "1990 Rule") (rejecting proposal to remove the term "specific" from the definition of "profession" on the ground that "[s]uch a change would mean that any field in which a college or university grants a degree would become a profession"); Matter of Michael Hertz Assocs., 19 I. & N. Dec. 558, 560 (BIA 1988) (explaining that "there must be a close corollary between the required specialized studies and the position" and that "[t]he mere requirement of a college degree for the sake of general education, or to obtain what an employer perceives to be a higher caliber employee, also does not establish eligibility").

'profession' and the standards for qualifying as a member of the professions," id.[16]  The proposed rule defined profession as follows:

> "Profession" means an occupation which requires theoretical and practical application of a body of highly specialized knowledge to fully perform the occupation in such fields of human endeavor as:  architecture, engineering, mathematics, physical sciences, social sciences, medicine and health, education, law, theology, and the arts.  A profession requires completion of a specific course of education at an accredited college or university, culminating in a baccalaureate or higher degree in a specific occupational specialty, where attainment of such degree or its equivalent is the minimum requirement for entry into the profession in the United States.  There are two categories of persons who do not meet these requirements but are nevertheless regarded as professionals.  They are persons who, after passage of normal professional tests and requirements, are granted full state licenses to practice the profession and persons who lack the required degree but, by virtue of a combination of academic training, experience, and accomplishments are in fact lawfully practicing at a professional level.

Id. at 28582; see also id. at 28578.[17]

Although the 1986 Proposal primarily "simply restated in regulatory form existing Service policy for the H nonimmigrant

_____

16  The proposed rule also stated that "H-1 classification may be granted to an alien who is of distinguished merit and ability. An alien of distinguished merit and ability is one who is a member of the professions . . . and who is coming to the United States to perform services which require a professional . . . ."  Id. at 28582.

17  The Service also proposed, as the first possible criterion for "qualifying as a member of the professions," that an individual "[h]old a United States baccalaureate or higher degree required by the profession from an accredited college or university."  Id. at 28578, 28579; see also id. at 28583.  With the exception of changing "profession" to "specialty occupation," this provision remains unchanged in the current H-1B Regulation.  See 8 C.F.R. § 214.2(h)(4)(iii)(C)(1).

classification," it "generated extensive interest from the general public, labor and management organizations, and Members of Congress regarding standards for the H-1 classification." Temporary Alien Workers Seeking Classification Under the Immigration and Nationality Act, 53 FR 43217-01, at 43218 (proposed Oct. 26, 1988) (the "1988 Proposal").

> Several Congressional Committees were concerned that the regulations may expand the number of H-1 workers admitted to this country and result in displacement of American workers or depression of wages and working conditions in certain occupations and industries. They requested that the Service delay publication of a final rule until October 1, 1988 and during the intervening year, determine the occupational backgrounds of H-1 workers, the impact of H-1 workers on the American workforce, wages and working conditions of H-1 workers, and the impact of proposed regulations on admission of H-1 workers in industries now utilizing such workers.

> The Service contracted with a well-known consulting firm to conduct a study on the impact of H-1 nonimmigrants on the American labor market. The results of the study were submitted to Congress in July 1988. Overall, the study found that the H-1 nonimmigrants admitted to the United States do not have an adverse impact on the labor market in terms of displacement of United States workers or depression of wages and working conditions. However, the study also found that a significant number of H-1 admissions are entry to mid-level professionals who only nominally meet the statutory standard of "distinguished merit and ability". These workers are, for the most part, sought by employers to meet labor shortages of American workers in occupational fields, such as nursing, engineering, and computer science. The contractor concluded that denial of H-1 petitions for such workers would result in undue hardship to employers and recommended a statutory change to establish a separate nonimmigrant category to accommodate them. The H-2 category would be inappropriate for these workers because it requires the jobs to be temporary in nature. Jobs filled by H-1 professional workers are usually permanent in nature.

> Congress [then] again delayed publication of a final
> rule on the [1986 Proposal] until October 1, 1989, to
> give itself an opportunity to review and respond to the
> study. Congress [needed] time to amend the statute to
> establish a separate nonimmigrant category for entry to
> mid-level professionals, or to pass a legal immigration
> bill which respond[ed] to the needs of the American labor
> market. In the meantime, the Service [wa]s faced with
> mounting litigation regarding the standards for
> professionals. In view of this, the Service [proposed a]
> significantly modified H rule which addresse[d] the major
> areas of concern of the public, employers, labor
> organizations and Congress.

Id. (emphasis added).

The 1988 Proposal retained the same description regarding H-1 classification and the degree criterion for qualifying as a member of the professions as the 1986 Proposal. (Compare 1988 Proposal, 53 FR 43217-01, at 43224, 43225, with 1986 Proposal, 51 FR 28576-03, at 28582, 28583.)[18] It also largely restated the definition of profession, merely adding two additional exemplars — "business" and "accounting" — and refining the description of the second category of persons who are "regarded as professionals" even though they "lack the required degree" so that it read: "by virtue of a combination of academic training and professional experience are in fact lawfully practicing at a professional level." 1988 Proposal, 53 FR 43217-01, at 43224.[19]

---

[18] Those portions of the regulation remained largely unchanged in the final rule as well. See 1990 Rule, 55 FR 2606-01, at 2623.

[19] The final rule further amended "business" to "business specialties" and made a few additional refinements regarding
(continued...)

After receiving comments on the 1988 Proposal, the Service issued a final rule in January 1990. In so doing, the Service explained that, based on the examples identified in the INA as professions, "the Service's interpretation over the years has been that the common denominator for determining that an occupation is a profession is the requirement of at least a baccalaureate degree awarded for academic study in a specific discipline <u>or narrow range of disciplines</u> for entry into the occupation." Temporary Alien Workers Seeking Classification Under the Immigration and Nationality Act, 55 FR 2606-01, at 2609 (Jan. 26, 1990) (emphasis added) (the "1990 Rule"); <u>accord</u> <u>Matter of Caron</u>, 19 I. & N. Dec. at 793 ("The clearest common denominator for professional standing is at least a baccalaureate degree awarded for academic study in a specific discipline <u>or narrow range of disciplines</u>." (emphasis added)). The Service further explained that one commentator

> recommended deletion of the word "specific" and the phrase "in a specific occupational specialty" from the definition of profession. That portion of the definition would then read, "A profession requires completion of a course of education at an accredited college or university, culminating in a degree, where attainment of such degree or its equivalent is the minimum requirement for entry into the profession in the United States."

1990 Rule, 55 FR 2606-01, at 2609. The Service rejected this proposal, noting that "[s]uch a change would mean that any field in

_____

19(...continued)
individuals who lacked the normal requirements. 1990 Rule, 55 FR 2606-01, at 2623.

44

which a college or university grants a degree would become a profession." Id.;[20] see also Matter of Michael Hertz Assocs., 19 I. & N. Dec. 558, 560 (BIA 1988) ("The mere requirement of a college degree for the sake of general education, or to obtain what an employer perceives to be a higher caliber employee, also does not establish eligibility.").

Accordingly, the Service adopted the following definition of profession in its final rule:

> "Profession" means an occupation which requires theoretical and practical application of a body of highly specialized knowledge to fully perform the occupation in such fields of human endeavor as: architecture, engineering, mathematics, physical sciences, social sciences, medicine and health, education, business specialties, accounting, law, theology, and the arts. A profession requires completion of a specific course of education at an accredited college or university, culminating in a baccalaureate or higher degree in a specific occupational speciality, where attainment of such degree or its equivalent is the minimum requirement for entry into the profession in the United States. There are two categories of persons who do not meet these requirements but are nevertheless regarded as members of a profession. They are: persons who, after passage of

---

20  For the same reasons, the Service rejected a proposal to recognize "a liberal arts degree [a]s an appropriate degree in a profession." Id.  In so doing, though, the Service noted that "many of an individual's college-level courses, regardless of how broad the major field, will closely relate to the coursework required for a more specific baccalaureate degree program.  When combined with appropriate experience, the holder of such a degree may be able to demonstrate membership in a specific profession." Id.; see also Matter of Michael Hertz Assocs., 19 I. & N. Dec. at 560 ("Since there must be a close corollary between the required specialized studies and the position, the requirement of a degree of generalized title, such as business administration or liberal arts, without further specification, does not establish eligibility.").

normal professional tests and requirements, are granted full state licenses to practice the profession; and persons who lack the required degree but, by virtue of a combination of education, specialized training and/or professional experience are recognized as members of a profession and are in fact lawfully practicing at a professional level.

1990 Rule, 55 FR 2606-01, at 2623.

The Service further explained that, with its 1988 Proposal, it "did not enumerate specific standards in the proposed rule for determining whether a position is a profession, except those included in the definition of a profession." Id. at 2609. However, intervening court decisions "ha[d] somewhat broadened the definition of a profession by holding that the complexity of a job's duties alone are sufficient to make it a profession, and a degree is not required." Id. at 2609, 2610. "If a job's duties are so complex that theory, knowledge, and skills normally gained by attainment of a baccalaureate or higher degree in certain occupational specialties are required, then the Service would conclude that the position is a profession." Id. at 2610 (emphasis added). However, the Service emphasized, "a standard of complexity of duties alone is insufficient to determine the professional nature of a position." Id.; see also id. (observing that "[j]obs of skilled workers often involve complex duties"). "To assure that the standards for a professional position are clear," the Service added "a new paragraph (h)(3)(iii)(A) . . . to the final

regulations to reflect the specific criteria which the Service uses." Id.

The forerunner to the Provision, this new paragraph stated:

(iii) Criteria and documentary requirements for a member of the professions. For H-1 classification as a member of the professions, the position offered to the alien must be in a profession and the alien must qualify as a member of the professions.

(A) Standards for a position in the professions. To qualify as a profession, the position must meet the following criteria:

(1) A baccalaureate or higher degree or its equivalent is normally the minimum requirement for entry into the particular profession;

(2) The degree requirement is common to the industry in parallel positions among similar organizations or, in the alternative, an employer may show that its particular position is so complex or unique that it can be performed only by a member of the profession;

(3) The employer normally requires a degree or its equivalent for the position;

(4) The nature of the specific duties are so specialized and complex that knowledge required to perform the duties is usually associated with the attainment of a baccalaureate or higher degree; and

(5) The position's level of responsibility and authority are commensurate with professional standing.

Id. at 2623.

Later that year, Congress amended the INA through the Immigration Act of 1990 (the "IMMACT"). See Temporary Alien Workers Seeking Classification Under the Immigration and Nationality Act, 56 FR 31553-01, at 31553 (proposed July 11, 1991) (the "1991 Proposal"). As relevant here, IMMACT "chang[ed] the

47

reference to aliens who are members of the professions to aliens in specialty occupations." Id. at 31554. Notably, though, according to the Service:

> [IMMACT's] definition and standards for an alien in a specialty occupation mirror the Service's current requirements for aliens who are members of the professions. [IMMACT] amended section 214 of the [INA] to define specialty occupation as an occupation which requires theoretical and practical application of a body of highly specialized knowledge, and attainment of a bachelor's or higher degree in the specific specialty (or its equivalent) is required as a minimum for entry into the occupation in the United States. It further required the alien to have any required state license to practice in the occupation, the degree required for the occupation, or experience in the specialty equivalent to completion of the degree and recognition of expertise in the specialty through progressively responsible positions. This proposed rule amends regulations at 8 CFR 214.2(h)(4)(iii) to change all references to "profession" to "specialty occupation" and to specify the same standards for qualifying as an alien in a specialty occupation that were indicated for an alien who is a member of the professions under existing regulations.

Id.

Thus, the 1991 Proposal listed the following definition and criteria for H-1B visas:

> (A) Specialty occupation means an occupation which requires theoretical and practical application of a body of highly specialized knowledge to fully perform the occupation in such fields of human endeavor as architecture, engineering, mathematics, physical sciences, social sciences, medicine and health, education, business specialties, accounting, law, theology, and the arts, and which requires completion of a specific course of education at an accredited college or university, culminating in a baccalaureate or higher degree in a specific occupational specialty, where attainment of such degree or its equivalent is the minimum requirement for entry into the occupation in the United States.

```
*******
```

(iii) Criteria and documentary requirements for H-1B petitions involving a specialty occupation — (A) Standards for specialty occupation position. To qualify as a specialty occupation, the position must meet the following criteria:

(1) A baccalaureate or higher degree or its equivalent is normally the minimum requirement for entry into the particular position;

(2) The degree requirement is common to the industry in parallel positions among similar organizations or, in the alternative, an employer may show that its particular position is so complex or unique that it can be performed only by an individual with a degree;

(3) The employer normally requires a degree or its equivalent for the position;

(4) The nature of the specific duties are so specialized and complex that knowledge required to perform the duties is usually associated with the attainment of a baccalaureate or higher degree.

Id. at 31559.

Multiple commentators criticized the 1991 Proposal as "too severe," noting that it "would exclude certain occupations from classification as specialty occupations. Most of these commenters suggested that the definition should be expanded to include those occupations which did not require a bachelor's degree in the specific specialty." Temporary Alien Workers Seeking Classification Under the Immigration and Nationality Act, 56 FR 61111-01, at 61112 (Dec. 2, 1991) (the "Final Rule"). Because the statutory definition of specialty occupation contains such

requirement, the Service declined that suggested amendment. <u>See</u> <u>id.</u> Accordingly, as relevant here, the Final Rule provided:

> (E) Specialty occupation means an occupation which requires theoretical and practical application of a body of highly specialized knowledge to fully perform the occupation in such fields of human endeavor including, but not limited to, architecture, engineering, mathematics, physical sciences, social sciences, medicine and health, education, business specialties, accounting, law, theology, and the arts, and which requires the attainment of a bachelor's degree or higher in a specific specialty, or its equivalent, as a minimum for entry into the occupation in the United States.
>
> *******
>
> (iii) Criteria for H-1B petitions involving a specialty occupation. — (A) Standards for specialty occupation position. To qualify as a specialty occupation, the position must meet one of the following criteria:
>
> (1) A baccalaureate or higher degree or its equivalent is normally the minimum requirement for entry into the particular position;
>
> (2) The degree requirement is common to the industry in parallel positions among similar organizations or, in the alternative, an employer may show that its particular position is so complex or unique that it can be performed only by an individual with a degree;
>
> (3) The employer normally requires a degree or its equivalent for the position; or
>
> (4) The nature of the specific duties are so specialized and complex that knowledge required to perform the duties is usually associated with the attainment of a baccalaureate or higher degree.

<u>Id.</u> at 61121.

In the years since the Final Rule issued, the Service has slightly revised the wording of the specialty occupation

definition.  <u>See</u> 8 C.F.R. § 214.2(h)(4)(ii).[21]  However, the "[s]tandards for [a] specialty occupation position," 8 C.F.R. § 214.2(h)(4)(iii)(A), remain unchanged from the Final Rule to the current H-1B Regulation.  <u>See</u> 8 C.F.R. § 214.2(h)(4)(iii)(A)(1)-(4).

**D.  Analysis**

Against this backdrop, the analysis turns to the proper interpretation of the Provision.  At first glance, as IXC contends, the Provision's plain language suggests a generic degree requirement.  <u>See, e.g.,</u> 8 C.F.R. § 214.2(h)(iii)(A)(1) ("A baccalaureate or higher degree or its equivalent is normally the minimum requirement for entry into the particular position.").  However, the Provision's inclusion of the defined term "specialty occupation" renders the Provision ambiguous, as it imports the requirement of "a bachelor's degree or higher in <u>a specific</u>

---

21 More specifically, the Service removed the words "to fully perform the occupation" and "such" from the definition, so that it now reads:

> Specialty occupation means an occupation which requires theoretical and practical application of a body of highly specialized knowledge in fields of human endeavor including, but not limited to, architecture, engineering, mathematics, physical sciences, social sciences, medicine and health, education, business specialties, accounting, law, theology, and the arts, and which requires the attainment of a bachelor's degree or higher in a specific specialty, or its equivalent, as a minimum for entry into the occupation in the United States.

8 C.F.R. § 214.2(h)(4)(ii).

specialty, or its equivalent," 8 C.F.R. § 214.2(h)(4)(ii) (emphasis added), into the standards for determining whether a position qualifies for H-1B status.[22]

Moreover, the history and structure of the H-1B Regulation further undercut the notion that the Provision imposes simply a generalized degree requirement. For instance, in construing the original "distinguished merit and ability" classification and in developing the current H-1B Regulation, the Service repeatedly emphasized the need for more than a generic college degree. See, e.g., 1990 Rule, 55 FR 2606-01, at 2609 (explaining that "the Service's interpretation over the years has been that the common denominator for determining that an occupation is a profession is the requirement of at least a baccalaureate degree awarded for academic study in a specific discipline or narrow range of disciplines for entry into the occupation" and rejecting request to

_____

22    Admittedly, the Service could have more clearly articulated this requirement. Cf. 8 C.F.R. § 214.2(h)(4)(iii)(C)(1) (requiring "a United States baccalaureate or higher degree required by the specialty occupation from an accredited college or university" (emphasis added)). However, rather than focusing on the contours of a professional degree, the Provision arose from the Service's desire to clarify that a job's sheer complexity, without an associated degree, could not render the job a profession. See 1990 Rule, 55 FR 2606-01, at 2609, 2610. Further, the Court must read the Provision in the context of the entire H-1B Regulation, see Kisor, __ U.S. at __, 139 S. Ct. at 2415-16 (explaining that, before and after finding regulatory ambiguity, courts must consider "the text, structure, history, and purpose of a regulation"), and here that approach precludes construction of the degree requirement as generic, see, e.g., 8 C.F.R. § 214.2(h)(4)(ii).

deem "a liberal arts degree [a]s an appropriate degree in a profession"); <u>Matter of Michael Hertz Assocs.</u>, 19 I. & N. Dec. at 560 ("Since there must be a close corollary between the required specialized studies and the position, the requirement of a degree of generalized title, such as business administration or liberal arts, without further specification, does not establish eligibility."); <u>Matter of Shin</u>, 11 I. & N. Dec. at 688 ("The mere acquisition of a degree or equivalent experience does not, of itself, qualify a person as a member of a 'profession.' The knowledge acquired must also be of nature that is a realistic prerequisite to entry into the particular field of endeavor.").

In addition, the Provision appears in the part of the H-1B Regulation immediately following the definition of "[s]pecialty occupation," 8 C.F.R. § 214.2(h)(4)(ii), and within the same subpart as the "[b]eneficiary qualifications," which repeatedly characterize the appropriate degree as "required by the specialty occupation," 8 C.F.R. § 214.2(h)(4)(iii)(C)(1) & (2); <u>see also</u> 8 C.F.R. § 214.2(h)(4)(iii)(C)(4) (requiring "education, specialized training, and/or progressively responsible experience that is equivalent to completion of a United States baccalaureate or higher degree in the specialty occupation"). Accordingly, USCIS could reasonably reject the notion, which Plaintiff urges (<u>see, e.g.,</u> Docket Entry 20 at 12), that any general college degree satisfies the Provision. <u>See, e.g.</u>, <u>Sagarwala v. Cissna</u>, 387 F. Supp. 3d 56,

66 (D.D.C. 2019) ("Accepting [the plaintiff's] proposed interpretation [of the Provision] — under which any job requiring a bachelor's degree would be eligible — risks expanding H-1B availability beyond [its] prescribed limitations. Indeed, one could argue that the statutory and regulatory framework compels USCIS's reading," under which "the position at issue must require the attainment of a bachelor's or higher degree in a specific specialty." (brackets, emphasis, and internal quotation marks omitted)).

The question then becomes whether the Decision's particular interpretation of the Provision — as requiring a degree in one singular subspecialty — warrants deference. See Kisor, __ U.S. at __, 139 S. Ct. at 2415-18. It does not.[23] To begin, Defendant has

---

23 It bears noting that the decisions upon which USCIS relies in arguing for deference — Saqarwala, Innova Solutions, Inc. v. Baran, 338 F. Supp. 3d 1009 (N.D. Cal. 2018) (see Docket Entry 18 at 9 n.5), Chung Song Ja Corp. v. USCIS, 96 F. Supp. 3d 1191 (W.D. Wash. 2015), and Irish Help at Home LLC v. Melville, 2015 WL 848977 (N.D. Cal. Feb. 24, 2015), aff'd, 679 F. App'x 634 (9th Cir. 2017) (see Docket Entry 22 at 8) — do not support a contrary conclusion. For instance, upon observing that "[t]he first regulatory criterion does not restrict qualifying occupations to those for which there exists a single, specifically tailored and titled degree program," the Chung Song decision finds that the disputed position qualified under the Provision and that, in holding otherwise, USCIS "impermissibly narrow[ed] the plain language of the statute." Chung Song, 96 F. Supp. 3d at 1198; see also id. at 1201 (remanding with orders to grant H-1B visa). In addition, Innova Solutions and Irish Help involved positions requiring generalized degrees. See, e.g., Innova Sols., 338 F. Supp. 3d at 1019-20 ("Similarly, [to Irish Help,] here the OOH profile indicates that a person need not have a specialized degree to be a Human Resources Specialist. Instead, a generalized bachelor's degree, such as a business
(continued...)

54

not shown that the Decision reflects "the [A]gency's 'authoritative' or 'official position,' rather than a[] more ad hoc

        23(...continued)
degree, will suffice."); <u>Irish Help</u>, 2015 WL 848977, at *7 ("[T]he record does not support that the Irish Help's deputy controller position is a distinct occupation, or that it requires a specialized course of study. Rather, the record indicates that the deputy controller position may be satisfied with a bachelor's degree in a more general field of study, such as business administration."); <u>see also id.</u> ("[T]he issue is that there is no credible evidence supporting that Irish Help's deputy controller position is specialized in the sense that the it [sic] could only be performed by one with specialized knowledge in a specialized course of study, as opposed to one with a more generic degree."). The final decision concerned a position initially advertised as seeking candidates with "'a minimum of a bachelor's degree in Computer Science, Information Technology, Mathematics, Engineering or its equivalent, as well as any other interested and qualified professionals with diverse backgrounds in the sciences, technology, engineering, or mathematics, who had the necessary quantitative and qualitative critical thinking skill sets,'" a description later revised to reflect that it "required a bachelor's degree 'in Computer Information Systems or a related field, such as Information Systems or Computer Science.'" <u>Sagarwala</u>, 387 F. Supp. 3d at 61 (brackets omitted). The plaintiff in that case argued that USCIS imposed a "'single degree rule'" in rejecting her application, a claim USCIS disputed, "arguing that it 'does not require a single degree,' but instead mandates that petitioners 'tie seemingly disparate degrees to the duties of a particular position.'" <u>Id.</u> at 64. The <u>Sagarwala</u> court declined to "involve itself in th[at] particular fight," <u>id.</u>, because it upheld USCIS's alternative ground (that petitioner failed to satisfy the Provision's criteria), <u>see id.</u> at 65 ("USCIS's reliance on § 214.2 to deny the H-1B petition was not dependent on any purported 'single degree' rule, and it was rationally explained and supported by the record."). In any event, the alleged "single degree" issue in <u>Sagarwala</u>, <u>see id.</u> at 65 n.3 (finding, in USCIS decision, that petitioner "'ha[d] not established how each of the qualifying fields of study that [it] ha[d] listed for the offered position [wa]s directly related to the duties and responsibilities of the position'"), differs markedly from the subspecialization issue in this case (<u>see</u> CAR 10 (rejecting engineering degree requirement on the ground that "a general degree in engineering or one of its other subspecialties, such as civil engineering or industrial engineering, is not closely related to mechanical engineering")).

statement not reflecting the [A]gency's views."  Id., __ U.S. at __, 139 S. Ct. at 2416.[24]

Moreover, the Decision's interpretation conflicts with the Agency's longstanding construction, which recognizes that a position can qualify as a specialty occupation even if it permits a degree in more than one academic discipline.  See, e.g., 1990 Rule, 55 FR 2606-01, at 2609 ("[T]he Service's interpretation over the years has been that the common denominator for determining that an occupation is a profession is the requirement of at least a baccalaureate degree awarded for academic study in a specific discipline or narrow range of disciplines for entry into the occupation." (emphasis added)); id. at 2610 (recognizing that "a job[]" (singular) can qualify as a profession if it requires a degree from among "certain occupational specialties" (plural)).  In short, the Decision requires a subspecialized degree, contrary to

---

24   Indeed, Defendant attempts to disclaim the Decision's subspecialization degree requirement.  In particular, Defendant argues that USCIS does not impose a "'One Degree'" rule (Docket Entry 22 at 9) and that "USCIS did not require one specific degree; it simply stated that the degree could not be a 'general degree'" (id. at 10 (quoting CAR 10)).  As discussed above, this argument inadequately accounts for language in the Decision that effectively imposes a subspecialization degree requirement.  (See, e.g., CAR 10 (rejecting position that requires "a bachelor's degree or higher in engineering" because "the field of engineering is a broad category that covers numerous and various specialties, some of which are only related through the basic principles of science and mathematics, e.g., nuclear engineering and aerospace engineering," and "[t]hus, a general degree in engineering or one of its other subspecialties, such as civil engineering or industrial engineering, is not closely related to mechanical engineering" (emphasis added)).)

the governing statute and the Agency's past practices, which declined to mandate such a heightened level of specialization. See, e.g., RELX, Inc. v. Baran, 397 F. Supp. 3d 41, 54-55 (D.D.C. 2019) (rejecting as "untenable" the notion that, "because different types of degrees would allow entry into [a] Data Analyst position, . . . a Data Analyst position may never be specialized," observing that "[t]here is no requirement in the statute that only one type of degree be accepted for a position to be specialized" and that "[n]owhere in the statute does it require the degree to come solely from one particular academic discipline"); Raj & Co. v. USCIS, 85 F. Supp. 3d 1241, 1247 (W.D. Wash. 2015) ("[The d]efendant's approach impermissibly narrows the plain language of the statute. The first regulatory criterion does not restrict qualifying occupations to those for which there exists a single, specifically tailored and titled degree program."); see also Matter of Essex, 14 I. & N. Dec. at 197 ("The Service has long held that a person who is qualified as a member of the professions qualifies as a person 'of distinguished merit and ability' as that term is used in section 101(a)(15)(H)(i)[ of the INA]. If, additionally, he is to temporarily perform specified services which require his professional abilities, he is qualified for 'H-1' classification.").

That the Decision deemed an engineering degree requirement too generalized further confirms the unreasonableness of the Decision's

interpretation. Importantly, the INA defines professions — the basis of the H-1B Regulation's specialty occupation requirement — at the categorical level (e.g., "lawyers" and "teachers," 8 U.S.C. § 1101(a)(32), rather than "tax lawyer" or "college English professor," see id.) and specifically includes "engineers," id. In addition, the specialty occupation provision arose from a need "to meet labor shortages . . . in occupational fields, such as nursing, engineering, and computer science." 1988 Proposal, 53 FR 43217-01, at 43218 (emphasis added). Put simply, in contrast to a liberal arts degree, which the Service deemed "an [in]appropriate degree in a profession" because of its "broad[ness]," 1990 Rule, 55 FR 2606-01, at 2609, an engineering degree requirement meets the specialty occupation degree requirement.

In sum, the Decision's interpretation of the Provision is "not in accordance with law," 5 U.S.C. § 706(2)(A). The Court should therefore grant Plaintiff's request to "hold unlawful and set aside [the Decision]," 5 U.S.C. § 706(2). See, e.g., Perez, __ F.3d at __, 2020 WL 611530, at *12.[25]

_____

25 Plaintiff also argues that the USCIS "interpreted the term 'normally' to mean more than 'most' or more than 70%. CAR 010 (noting the evidence demonstrates 'only that most but not all of the occupations . . . require a bachelor's degree' and finding evidence that demonstrates '70% of those working as QA engineers have at least a bachelor's degree' is insufficient)." (Docket Entry 20 at 9 (ellipsis in original).) Defendant responds that "USCIS did not deny IXC's petition because some quality engineer positions do not require a degree, while most normally do; instead, USCIS pointed out IXC's failure to prove that the proffered
(continued...)

### III.  Cope's Evidence

Finally, to avoid a recurrence on remand, and because it alternatively justifies relief, see, e.g., Motor Vehicle Mfrs., 463 U.S. at 43 (explaining that "the agency must examine the relevant data"), this Opinion will briefly address IXC's contention that the Decision improperly ignored Cope's expert opinion.  (See, e.g., Docket Entry 20 at 15-18.)  For instance, according to IXC, "[t]he Agency ignore[d] completely [Cope's third letter's] more detailed descriptions related to the sophistication of the [Quality Engineer] position," including its "samples of [Kasilingam's] work product."  (Id. at 17.)  This contention possesses merit.

First, relying on Cope's second letter's synopsis of the Quality Engineer's job duties, the Decision criticizes IXC for allegedly "describ[ing] the duties of the proffered position in

---

25(...continued)
position normally requires a degree in a specific specialty." (Docket Entry 22 at 10 (contending that this "issue[] come[s] back to the interpretation issue [regarding the Provision]").)  The Decision reflects some ambiguity on this point (see CAR 10), but to the extent that USCIS construed "normally" to require something more than "most" or "70%" (see id. (emphasizing that a cumulative 22% of O*NET respondents possessed only an associate's degree or a post-secondary certificate)) it erred, see, e.g., Perez, __ F.3d at __, 2020 WL 611530, at *8 (looking to "ordinary meaning" of term used in immigration provision); see also Normally, Oxford University Press, https://www.lexico.com/en/definition/normally (last visited Mar. 5, 2020) (defining "normally" as "[u]nder normal or usual conditions[]. . ." and "in the usual way" and identifying as synonyms, "usually, ordinarily, commonly, . . . generally, in general, . . . mostly, . . . most of the time, . . . more often than not" and "regularly" (emphasis omitted)).

relatively generalized and abstract terms that do not relate substantial details about either the position or its constituent duties." (CAR 18; see also CAR 480-481 (containing relevant list).) "For example, [the Decision states,] the [identified] duties do not provide details regarding the beneficiary's specific role in the duties to "'[apply] knowledge of mechanical engineering and CAD to participate in product design reviews ...', and '[s]erve as the company's "quality advocate" for the mechanical engineering functional component area.'" (CAR 18 (ellipsis and third and fourth sets of brackets in original).) In sum, according to the Decision, "[t]he duties as described do not communicate: (1) the actual work that the beneficiary would perform; (2) the complexity, uniqueness and/or specialization of the duties; or (3) the correlation between that work and a need for a particular level education of highly specialized knowledge in a specific specialty." (Id.)

In reaching this conclusion, however, the Decision entirely overlooks Cope's third letter, which provides a detailed explanation of the Quality Engineer's duties, explains "the correlation between that work and a need for a particular level education of highly specialized knowledge" (id.), specifically, that obtained by studying mechanical engineering and/or computer science, and provides samples of "the actual work that the beneficiary would perform" (id.), complete with explanations

regarding the necessary educational underpinnings for such work. (See CAR 92-120.) Accordingly, the Agency's determination that IXC "ha[d] not shown that the proffered position is a specialty occupation," necessitating the Petition's "deni[al] on th[at] basis alone" (CAR 18), "was not 'based on a consideration of the relevant factors,'" RELX, 397 F. Supp. 3d at 55; see also Motor Vehicle Mfrs., 463 U.S. at 43 (noting that "the agency must examine the relevant data"), and "runs counter to the evidence before the [A]gency," Motor Vehicle Mfrs., 463 U.S. at 43.

Similarly, in evaluating whether IXC satisfied the Provision's criteria, the Decision ignores important aspects of Cope's third letter. For instance, the Decision maintains that the letter "provides no relevant details as to the unique or complex nature of the" Quality Engineer position, citing as an example "the beneficiary's duty to 'supervise intern employees as required.'" (CAR 22.) According to the Decision, "Mr. Cope merely states that the beneficiary is expected to 'work with' summer interns so that they 'understand the common goal of the team.' Mr. Cope does not elaborate on how the beneficiary will 'work with' these interns, or why he believes explaining the company's goals to summer interns requires a baccalaureate degree or higher." (Id.)

However, Cope's third letter does in fact elaborate upon the various ways that the Quality Engineer "works with" the interns, whom he, inter alia, "educates . . . on how [IXC's] technology

products for the manufacturing industry are supposed to work from a practical engineering perspective," so that, under his "guidance," they can "work on systems that report the quality of the code that is being written at IXC." (CAR 94.) Moreover, the letter contains detailed descriptions of the Quality Engineer's remaining duties — which comprise 90% of his responsibilities (see CAR 18) — as well as both a lengthy course-by-course analysis of the importance of a mechanical engineering and/or computer science degree for the Quality Engineer role and annotated samples of Kasilingam's actual work. (See CAR 92-120.) The Decision lacks any indication that USCIS considered those materials. (See CAR 15-23.)[26]

Because the Decision fails to address this evidence, which bears directly on the determination of whether IXC established that its Quality Engineer position qualifies as a specialty occupation, the Decision falls short under the arbitrary and capricious standard. See Motor Vehicle Mfrs., 463 U.S. at 43 ("Normally, an agency rule would be arbitrary and capricious if the agency has

---

26 Further, although it maintains that the record contains insufficient evidence of contractual relationships between IXC and, inter alia, "Solidworks" (CAR 22), the Decision does not show that it considered the evidence regarding IXC's longstanding relationship with SolidWorks. (See, e.g., CAR 334-347, 300-321 (containing contracts between IXC and SolidWorks dating back to at least 2013); see also CAR 607, 613 (noting, in third-party case studies, that "[t]he InspectionXpert platform is also fully integrated with many popular CAD packages including . . . SolidWorks" (CAR 607) and that "InspectionXpert for SolidWorks is a SolidWorks Gold Partner product" (CAR 613)).)

. . . entirely failed to consider an important aspect of the problem [or] offered an explanation for its decision that runs counter to the evidence before the agency . . . ."). For this reason as well, the Court should grant Plaintiff's Motion to set aside the Decision.[27]

## CONCLUSION

The Decision misinterprets the Provision and inadequately addresses relevant evidence.

**IT IS THEREFORE RECOMMENDED** that Defendant's Motion (Docket Entry 17) be denied.

**IT IS FURTHER RECOMMENDED** that Plaintiff's Motion (Docket Entry 19) be granted, the Decision be set aside, and the Agency be

---

27 In light of this resolution, the Court need not rule on IXC's alternative grounds for reversal, especially given that, upon proper consideration of the Provision and Cope's evidence, the Agency may not need to address those issues again on remand. The parties' failure to provide authority dealing with the particularities of the third criterion (see Docket Entry 18 at 14-15 (lacking relevant authority); Docket Entry 20 at 18-19 (same); Docket Entry 21 at 6-7 (same); Docket Entry 22 at 11 (same); Docket Entry 23 at 6 (same); Docket Entry 24 at 4 (same)) further counsels against judicial exposition on that issue at this juncture, see M.D.N.C. LR 7.2(a)(4) (mandating that briefs "refer to all statutes, rules and authorities relied upon"). However, to the extent that evidentiary issues remain on remand, it bears noting both that Dr. Wodo's expert report reflects a greater familiarity with IXC than the Decision acknowledges (see CAR 46 (discussing relevance of Kasilingam's master's degree project to IXC's business)), and that the Agency may "reopen[ the] proceedings to take new evidence," PPG Indus., Inc. v. United States, 52 F.3d 363, 366 (D.C. Cir. 1995) (noting that "the Supreme Court has specifically indicated that a reopening is one of the courses an agency may follow after a reviewing court has determined that the agency's initial determination included an error of law").

ordered "to adjudicate the [P]etition anew in compliance with [the] law" (id. at 1).

This 5th day of March, 2020.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**